UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

TANZANIAN ROYALTY EXPLORATION
CORPORATION,                                          Case No. 18-Civ-4201

                              Plaintiff,

              -against-                                **COMPLAINT**

CREDE CG III, LTD., TERREN PEIZER, and
MICHAEL S. WACHS, WELLINGTON SHIELDS &
CO, LLC

                              Defendants.
------------------------------------------------------------------X

      Plaintiff Tanzanian Royalty Exploration Corporation ("TREC"), by its attorneys Lewis

Brisbois Bisgaard & Smith LLP,  brings this action under the federal securities laws based on

securities fraud, and for breach of contract, against Defendants Crede CG III, LTD. ("Crede"),

Terren Peizer ("Peizer"), Michael S. Wachs ("Wachs"), and Wellington Shields & Co., LLC

("Wellington") (collectively "Defendants").

                              **PARTIES**

      1.    TREC is incorporated in Alberta, Canada and has its principal place of business in

Toronto, Ontario.

      2.    TREC is a mineral resource company engaged in the acquisition of interest in and the

exploration and development of natural resource properties in the United Republic of Tanzania.

      3.    Defendant Crede is a Bermuda company with its principal place of business in Los

Angeles, California.

      4.    Defendant Terren Peizer is a principal of Crede and a resident of the State of New

York.

5.      Defendant Michael S. Wachs is a principal of Crede and a resident of the State of New York.

6.      Defendant Wellington is a limited liability company and a broker dealer registered with the Securities Exchange Commission ("SEC") under Section 15 of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §78o and regulated by the Financial Industry Regulatory Authority ("FINRA").

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this action pursuant to Section 27 of the Exchange Act, 15 U.S.C. §§ 78aa and 78m(d)(3). This Court also has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1337. The claims asserted herein arise under Sections 10(b) and 13(d) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78m(d), and the rules and regulations promulgated thereunder, including SEC Rules 10b-5 (17 C.F.R. § 240.10b-5) and 13d-1 (17 C.F.R. § 240.13d-1).

8.      This Court has personal jurisdiction over Defendants because Crede, Peizer, Wachs and Wellington do business in New York, Crede maintains a New York office in which Peizer and Wachs are employed, Wellington maintains a New York office, and a substantial part of the events giving rise to this dispute occurred in New York.

9.      Jurisdiction and venue are proper by agreement of the parties. Section 9(a) of the Securities Purchase Agreement between TREC and Crede, and Section 11 of the Series A and Series B Warrants, state that each party "irrevocably submits to the exclusive jurisdiction of the state and federal courts sitting in the City of New York, Borough of Manhattan, for the adjudication of any dispute" arising from the Securities Purchase Agreement, the Series A and Series B Warrants, or with any transaction contemplated thereby.  Section 10(c) of the Placement Agent Agreement

between TREC and Wellington provides that the "parties hereby irrevocably and unconditionally submit to the jurisdiction of the federal and state courts located in the Sate of New York, for any dispute related to this Agreement or any of the matters contemplated hereby…"

10.     Declaratory relief is appropriate pursuant to 28 U.S.C. § 2201 because an actual controversy exists regarding Defendants' fraudulent scheme under Sections 10(b) and 13(d) of the Exchange Act and SEC Rules 10b-5 and 13d-1.

## INTRODUCTION

11.     This action involves the concerted efforts of Crede and its principals Peizer and Wachs, with the active participation of Wellington, to conceal the payment of unlawful commissions to an unregistered broker dealer, to misrepresent the purchase price to be paid by Crede for the purchase of TREC's common stock, and to employ a deceptive scheme to manipulate the share price of TREC common stock by concealing Crede's  purchase and sales of millions of shares of TREC common stock in violation of applicable securities disclosure laws and Crede's contractual obligations, all in order to surreptitiously influence the "cashless exercise" formula in certain warrants issued to Crede in September and October 2016.

12.     The first step in Defendants' scheme was to conceal from TREC that Crede had manipulated the variable inputs that comprise what is commonly known as the Black Sholes Option Pricing Model in the bowels of a contract definition buried within the document in such a way that TREC would be misled into believing that the variable inputs had not been manipulated and that the inputs to the model would be what is commonly understood to be included in the commonly known calculation and not what was surreptitiously changed by Crede and Wellington.

13.     Crede and Wellington also orchestrated the payment of an unlawful sales commission to an unregistered broker dealer acting on behalf of Crede and which Crede was contractually

indebted to pay, thereby in effect reducing the purchase price paid by Crede for TREC common stock and making Crede and Wellington's representations as to the amount of the purchase price to be paid by Crede materially false and misleading.

14.     The second step in Crede and Wellington's artifice was to represent to TREC in the preparation of a registration statement that the cashless exercise formula for the warrants would be based upon "the Black Sholes value" without disclosing that the changes it had made to the variable inputs into the Black Sholes Option Pricing Model would have such an unconscionable and exaggerated effect on the number of shares issuable upon the exercise of the warrants rendering this statement to be at best materially misleading and at worst entirely false.

15.     In furtherance of the scheme to defraud TREC and conceal the unconscionable effect of the surreptitious changes made to the variable inputs to be used to calculate the Black Sholes Value, Crede also misrepresented that the number of shares that was included in the registration statement represented the total number of shares "issuable" under the warrants when, in fact, using Crede's perverted formula, this statement was materially false in that the actual number of shares issuable under the warrants at the time of making the statement would have been over 300,000 shares more than covered by the registration statement.

16.     Under the terms of a Registration Rights Agreement entered into with TREC, Crede, through its designated "Legal Counsel," was vested with the power to "review and oversee, solely on its behalf" all of the disclosures in the registration statement, including the calculation of the number of shares "issuable" under the warrants as well as the disclosures relating to the application of the Black Sholes Option Pricing Model to the cashless exercise of the warrants.

17.     Crede's failure to disclose that it had altered the industry standard variable inputs in the Black Sholes Option Pricing Model made its statement that the cashless exercise of the warrants would be calculated "using the Black Sholes Value" materially false and misleading.

18.     After the registration statement was declared effective, Crede then began dumping the shares it received from TREC in order to drive the share price of TREC common stock down below the exercise price of the warrants in order to invoke the warrant's "cashless exercise" provisions.

19.     Crede was able to conceal this fraud by virtue of its violation of the securities law in failing to file its required Schedule 13D disclosures.

20.     Crede continues to intentionally disregard its legal obligation to disclose its beneficial ownership of TREC common stock on Schedule 13D and the nature and extent of its manipulative trading in TREC common stock as required by the federal securities laws, the result of which has negatively effected the share price of TREC common stock.

21.     The share price at the time of a cashless exercise of the warrants is the denominator in the cashless exercise conversion formula in the warrants resulting in a greater number of shares to be issued on exercise as the share price declines.

22.     In furtherance of its fraudulent scheme, on March 23, 2018, Crede filed a materially false and misleading Schedule 13G and an amendment to the Schedule 13G with the Securities and Exchange Commission with the "Date of Event Which Requires the Filing of this Statement" backdated to September 26, 2017, and March 7, 2017, respectively.

23.     Both of Crede's filings falsely certified that "the securities referred to above were not acquired and are not held for the purpose of or with the effect of changing or influencing the control of the issuer" when, in fact, Crede has the absolute veto power under Section 4(b) of the Series A

and Series B Warrant Agreements over all "Fundamental Transactions" that TREC may enter into thereby substantially influencing control over TREC.

24.     As a consequence, Crede was not eligible to file a Schedule 13G, but instead is required to file a Schedule 13D which would be required to provide substantially more detailed disclosure over Crede's trading activities.

25.     In addition, in both filings, Crede materially misstated its beneficial ownership as calculated under SEC Rule 13d-3 by calculating the number of shares issuable upon exercise of the Series A and Series B Warrants by using the unaltered industry standard inputs for the Black Sholes Option Pricing Model instead of the materially altered inputs under its perverted version of the Black Sholes Option Pricing Model that it now contends applies.

26.     Absent injunctive relief prohibiting Crede from continuing to acquire TREC common stock through the exercise of warrants until it files a Schedule 13D with full disclosure of all facts required to be disclosed under Schedule 13D and correcting the materially misstatements made by Crede in its erroneously filed Schedule 13G, Crede will continue manipulating TREC's common stock price, resulting in irreparable harm to TREC and the public shareholders of TREC, including likely delisting from the New York Stock Exchange ("NYSE") and the loss of needed financing.

27.     Crede is also liable to TREC under SEC Rule 10b-5 for intentionally concealing the payment of unlawful sales commissions it was obligated to pay and for its surreptitious changes to the variable inputs to the Black Sholes Option Pricing Model making its representations that the cashless exercise of the warrants would calculating "using the Black Sholes Value" false and misleading as well as other material false and misleading statements in the registration statement describing the cashless exercise of the warrants without disclosing the changes it had made to the variable inputs that go into the Black Sholes Option Pricing Model.

28.     In the subsequent exercise of Series A Warrants and in the attempted exercise of Series B Warrants, Crede  represented the current share price in its written notice of exercise without disclosing to TREC that it had sold shares of TREC common stock in a manner  that was causing the price for the shares to decline thereby manipulating the number of shares issuable under the warrants.

29.     In addition, by not making its required Schedule 13D disclosures, Crede is depriving the public markets of material information that is required to be disclosed by federal law and that is needed to accurately and fairly influence the market price for TREC common stock on the NYSE American stock exchange.

30.     TREC reasonably and justifiably relied on all of the foregoing material misstatements and misleading statements in the exercise of the Series A Warrants and which resulted in Crede being able to fraudulently obtain a far greater number of shares upon exercise of the Series A Warrants that it was entitled to receive.

31.     TREC, in the position of a seller of its common stock with respect to the exercise of the Series A Warrants by Crede, relied on the presumption that its market price reflected all publicly available information and the written representation by Crede in its Notice of Exercise that the represented market price reflected all material information Crede was required to provide through legally mandated disclosure.

32.     By not disclosing its trading activities in TREC common stock, Crede hid from both TREC and the public market Crede's manipulations intended to depress the price of TREC's common stock.

33.     Crede's actions also constitute a material breach of its agreement with TREC and the implied covenants of good faith and fair dealing.

## THE SECURITIES PURCHASE AGREEMENT

34.     In the summer of 2016, a cold caller who, upon information and belief, was Filip Kisin, whose LinkedIn page describes him as "an Affiliate of Wellington Shields & Co.," contacted TREC asking whether it was interested in a financing arrangement and advised that Wellington might have potential investors interested in investing in TREC.

35.     TREC's Executive Chairman James A. Sinclair ("Sinclair") met with representatives from Wellington in or around August 2016.

36.     While in Wellington's New York City office during his first visit, Wellington advised Sinclair that Crede was prepared to invest five million dollars in TREC and produced a term sheet describing the terms of the proposed investment.

37.     Prior to this time, TREC had no prior dealings with Wellington, Crede, Peizer, or Wachs.

38.     On information and belief, Wachs was coordinating the negotiations and Wellington knew, or was reckless in not knowing, that Wachs is a convicted felon who was barred by FINRA in 1998 for stealing approximately $20,800,000 from a FINRA member firm and that Wachs has a history of coordinating the payment of illegal kickbacks to unlicensed broker dealers in violation of federal securities laws and FINRA rules.

39.     On further information and belief, Wachs, on behalf of Crede, and Wellington agreed to the payment of an unlawful kickback to unlicensed broker dealers affiliated with Crede (by the name of Jess Mogul) and Wellington (by the name of Filip Kisin) from the proceeds of an investment Crede intended to make in TREC and to conceal from TREC that payments would be made to unlicensed broker dealers and as an additional aspect of their agreement, to cooperate with each other in inducing TREC into issuing warrants with a "cashless exercise" provision that Crede

and Wellington would represent was based upon the industry standard Black Sholes Option Pricing Model, but would be significantly changed in the warrant agreements resulting in such description being false and materially misleading.

40.    On September 1, 2016, TREC and Crede entered into a Securities Purchase Agreement (the "SPA") and other transactional agreements that included a Registration Rights Agreement, pursuant to which Crede agreed to make a two-tranche investment in TREC. Simultaneously with entering into the SPA, TREC and Wellington entered into a Placement Agent Agreement (the "PAA") wherein Wellington agreed to act as TREC's "exclusive placement agent" in connection with the investment by Crede.

41.    In both the SPA and the PAA, the defendants represented that the purchase price for TREC common stock to be paid in the first tranche was $1,250,000 when in fact the real purchase price, through the orchestrated payment of unlawful commissions for which Crede was obligated to pay, was $1,185,000, or 5.2% less than was represented.

42.    The SPA had two separate closings. In the first closing on September 1, 2016, for a misrepresented purchase price of $1,250,000 which was in fact only $1,185,000, Crede purchased 1,840,400 shares of TREC common stock and a Series A Warrant providing Crede the right to purchase 1,840,400 shares of TREC common stock at an exercise price of $0.8291 per share.

43.    The second closing occurred on September 26, 2016, at which time Crede paid $3,750,000 for a convertible note that immediately converted into 5,357,143 shares of common stock, and a Series B Warrant providing Crede the right to purchase 4,017,857 shares of TREC common stock at an exercise price of $1.10 per share.

44.     Under the SPA, Crede is prohibited from exercising warrants that would result in Crede having a greater than a 9.9% beneficial ownership interest in TREC as calculated under SEC Rule 13d-3.

45.     On September 1, 2016, TREC had 109,068,492 shares of common stock issued and outstanding.  Currently, TREC has 121,780,000 shares of common stock issued and outstanding. As of the second closing of the SPA, Crede had "beneficial ownership" – as defined in SEC Rule 13d-3(d)(1)(i)(A) – of 13,055,800 shares of TREC's common stock when taking into effect the right to acquire shares underlying the Series A and Series B Warrants.

46.     As such, as of September 26, 2016, Crede was a beneficial owner of 9.9% of TREC's common stock – when taking into account the cap on beneficial ownership.

47.     Crede has been a beneficial owner of greater than 5% of TREC's common stock from September 26, 2016, through the present.

48.     Crede has failed to file a Schedule 13D disclosure with the Securities and Exchange Commission ("SEC") to disclose its greater than 5% beneficial ownership stake and all subsequent purchases and sales of TREC common stock.

49.     Instead, Crede belatedly filed a materially false and misleading Schedule 13G, which it is not eligible to file, which misrepresents the amount of TREC common stock that it beneficially owns by purporting to apply the traditional industry accepted inputs to the Black Sholes Option Pricing Model and concealing the fact that it has materially and substantially altered these inputs resulting in a material misstatement of its beneficial ownership as calculated under SEC Rule 13d-3.

50.     The Series A and Series B Warrants (the "Warrants") provided for two methods to exercise the right to purchase shares. Under one method, Crede could exchange Warrant Shares for the right to purchase the same number of shares of TREC common stock at the applicable exercise

price.  For example, Crede wuld exchange 500 Series A Warrant Shares for 500 shares of TREC common stock  at the exercise price equal to $.8291 per share.

51.     The Warrants also contain a "cashless exercise" provision whereby Crede could use Warrant shares as currency to purchase TREC common stock in the event TREC's stock price fell below the exercise price in the Warrants.

52.     The amount of shares Crede could obtain via a cashless exercise is calculated by the following formula set forth in the Warrants: A (total number of warrant shares with respect to which the warrant is being exercised) x B (the Black Sholes Value) / C (the closing price of the stock as of two trading days prior to the exercise).

53.     The Black Sholes Value in the formula uses a pricing model commonly known as the Black Sholes Option Pricing Model which is used to determine the fair price or theoretical value of an option using the current market value of the shares underlying the option as the first component in the model. The Black Sholes calculation takes into account the following five inputs: (1) current underlining price of the shares issuable on exercise of the option; (2) the exercise price of the option; (3) the risk-free interest rate (typically the rate for U.S. Treasury Bonds); (4) implied or expected volatility of the market for the shares underlying the option; (5) the time until the expiration of the term of the option.

54.     In what appears to have been the first step in its fraudulent scheme, Crede, with the active participation of Wellington, buried an incorrect Black Sholes formula in the Warrants, which enabled Crede to obtain far more shares via a cashless exercise than was contemplated by the SPA and then misrepresented the incorrect formula as the commonly understood correct formula that is based upon the variable inputs that are applicable to the specific option and the specific security covered by the option.

55.     Instead of the actual Black Sholes formula, the definition buried in Section 16 of the Warrants erroneously perverted the inputs into the model by changing the first variable input from the current market price of the security covered by the option to the exercise price of the option so that the first two variable inputs would be equal.

56.     Next, Crede changed the implied volatility variable from TREC's true volatility using the actual prices for TREC common stock to a fixed amount equal to 135%.

57.     Finally, Crede changed the last variable input from the remaining term of the option to a perpetual five year term.

58.     These three changes have a substantial and unconscionable effect on the model's value such that the value generated has no basis in the foundation or science that the Black Sholes Option Pricing Model was based upon.

59.     At no point was including a perverted Black Sholes model discussed, contemplated or agreed to by TREC.  In fact, Sinclair had instructed Wellington that he would never agree to a cashless exercise that would result in a "toxic warrant."

60.     In order to guard against the very activity in which Crede is now engaging, the SPA required Crede to expressly covenant that [f]or so long as the Buyer or any of its Affiliates holds any Securities, neither Buyer nor any Affiliate will: …(ii) engage or participate in any actions, plans or proposals which relate to or would result in …(h) causing a class of securities of the Company to be delisted from a national securities exchange or to cease to be authorized to be quoted in an inter-dealer quotation system of a registered national securities association.

61.     Crede has now done exactly that in material breach of the SPA by manipulating TREC's stock to put it at risk of being delisted by the NYSE and losing financing.

## CREDE IMPLEMENTS ITS PLAN TO ACQUIRE
## TREC STOCK THROUGH MANIPULATION OF ITS PRICE

62.     On September 8, 2016, TREC's stock closed at $1.05 per share.

63.     By January 6, 2017, TREC's stock price had lost almost 50% value and closed at $.56 per share.

64.     Crede had dumped the stock it acquired and withheld all information concerning this by intentionally not making the required disclosures. As a result, TREC's market price did not reflect all publicly available information.

65.     On April 17, 2017, Crede delivered an exercise notice for a cashless exercise of 363,519 Series A Warrant shares for 520,833 shares of TREC common stock presenting a closing stock price of $.48 per share without disclosing to TREC that it was not providing its legally mandated disclosure to the public markets and therefore the closing price represented in the exerice notice did not reflect Crede's manipulation of the price.

66.     TREC reasonably relied on Crede's representation of the market price for TREC common stock and was not aware of Crede's violations of its legally mandated disclosure nor was it aware Crede was using a formaul for the Black Sholes Option Pricing Model that had been changed by Crede.

67.     On May 8, 2017, Crede delivered an exercise notice for a cashless exercise of 364,519 Series A Warrant shares for 537,633 shares of TREC common stock representing a closing stock price of $.465 per share without disclosing to TREC that it was not providing its legally mandated disclosure to the public markets and therefore the closing price represented in the exercise notice did not reflect the Crede's manipulation of the price.

68.     TREC reasonably relied on Crede's representation of the market price for TREC common stock and was not aware of Crede's violations of its legally mandated disclosure nor was it

aware Crede was using a formula for the Black Sholes Option Pricing Model that had been changed by Crede.

69.     TREC issued 537,633 shares of TREC common stock on May 15, 2017 to Crede as a partial exercise of the Series A Warrant. Under the correct Black Sholes calculation, Crede was entitled to only 259,916 shares of common stock.

70.     On July 17, 2017, Crede delivered another exercise notice for a cashless exercise of 500,000 Series A Warrant Shares for 788,478 shares of TREC common stock based on a closing stock price of $.46 per share without disclosing to TREC that it was not providing its legally mandated disclosure to the public markets and therefore the closing price represented in the exercise notice did not reflect the Crede's manipulation of the price.

71.     TREC reasonably relied on Crede's representation of the market price for TREC common stock and was not aware of Cede's violations of its legally mandated disclosure nor was it aware of Crede's was using a formula for the Black Sholes Option Pricing Model that had been changed by Crede.

72.     TREC issued 788,478 shares of TREC common stock on July 17, 2017 to Crede as a partial exercise of the Series A Warrant. Under the correct Black Sholes calculation, Crede was entitled to only 343,627 shares of common stock.

73.     On August 21, 2017, Crede delivered another exercise notice for a cashless exercise of 613,363 Series A Warrants Shares for 1,112,331 shares of TREC common stock based on a closing stock price of $.40 per share without disclosing to TREC that it was not providing its legally mandated disclosure to the public markets and therefore the closing price represented in the exercise notice did not reflect the Crede's manipulation of the price.

74.     TREC reasonably relied on Crede's representation of the market price for TREC common stock and was not aware of Crede's violations of its legally mandated disclosure nor was it aware  Crede was using a formula for the Black Sholes Option Pricing Model that had been changed by Crede..

75.     TREC issued 1,112,331 shares of TREC common stock on August 21, 2017 to Crede as a partial exercise of the Series A Warrant Under the correct Black Sholes calculation, Crede was entitled to only 408,525 shares of common stock.

76.     As of August 21, 2017, Crede had "cashless exercised" 1,840,400 Series A Warrant shares for 3,146,944 shares of TREC common stock.

77.     At no point did Crede file its Schedule 13D to disclose to the public markets its greater than 5% beneficial ownership interest in TREC or Crede's purchase and sales of TREC common stock that was manipulating the price of TREC common stock.

78.     Crede did not file the Schedule 13D despite having acquired 2,438,442 additional shares of TREC's common stock through its cashless warrant exercises.

79.     From September 2016 to August 2017, during which Crede illegally concealed its trading activity, TREC's stock price had declined over 60%.

80.     As a result of Crede's intentional failure to make the required disclosure, Crede was able to deceive the public markets and TREC and its shareholders by concealing its accumulation and subsequent manipulative disposition of TREC common stock.

81.     By intentionally disregarding its duties under the securities laws, Crede was also able to hide the manner in which it was disposing of the TREC common stock it had accumulated and how such dispositions were adversely affecting the price of TREC common stock.

82.     Crede manipulated the public price of TREC's common stock by concealing to the market exactly when and how many shares, and at what price, it sold the shares it received from TREC. In doing so, Crede was able to depress TREC's stock price, which enabled Crede to convert its Warrants into a greater number of shares then it would otherwise be entitled to.

83.     This type of fraudulent and deceptive conduct is exactly what Section 13(d) of the Exchange Act was enacted to prevent.

84.     TREC processed these exercise notices in reliance on Crede's representation of the market price while Crede was not disclosing to TREC or the public markets that it was manipulating the price by not making its legally mandated Schedule 13D disclosure of the nature and extent of Crede's purchases and sales and in further reliance on the precept that its market price reflected all available information that is legally mandated.

85.     Because Crede was concealing its trading activity, TREC had no idea how quickly Crede was dumping TREC common stock, or at what price. Had Crede made the required disclosures, TREC would have become aware that Crede was intentionally trying to depress TREC's stock in order to increase the number of shares it could acquire on each cashless exercise, would have discovered that Crede was using an incorrect calculation for the Black Sholes Value and it would have objected to the request to process the exercise notices.

86.     Absent injunctive relief, Crede will continue to accumulate TREC's shares and conceal its actions from the markets.

87.     On January 3, 2018, Crede attempted to continue its fraudulent scheme by delivering another exercise notice for cashless exercise of 500,000 Series A Warrant shares for 1,393,927 shares of common stock based on a closing stock price of $.2602 per share without disclosing to TREC that it was not providing its legally mandated disclosure to the public markets and therefore

the closing price represented in the exercise notice did not reflect the Crede's manipulation of the price.

88.     On January 5, 2018, Crede delivered another exercise notice for a cashless exercise of 800,000 Series A Warrant shares for 1,706,824 shares of TREC stock based on a closing stock price of \$.34 per share without disclosing to TREC that it was not providing its legally mandated disclosure to the public markets and therefore the closing price represented in the exercise notice did not reflect the Crede's manipulation of the price.

89.     TREC was now in danger of being delisted by the NYSE as its share price was close to falling below \$.20 per share.

90.     As a result of the January 3 and 5 exercise notices, TREC realized that Crede was trying to exercise more Series A Warrant shares than specified in the Series A Warrant and that were included in the registration statement as "issuable" under the Series A Warrant.

91.     At or about this time, TREC also discovered that Crede was using the perverted Black Sholes Value instead of the true Black Sholes Value it mislead TREC that would be used in the calculation for the "cashless exercise" of the Warrants.

92.     Crede's scheme also becomes clear by comparing the common stock it was asking for in each exercise notice.

93.     The May notice exchanged 364,519 Warrant shares for 537,633, approximately 1.47 shares of common stock for each Warrant share, based on a closing price of \$.465 per share. The August notice, based on a closing price of \$.40 per share, exchanged 613,363 Warrant shares for 1,112,331 shares of common stock, approximately 1.8 shares of common stock for every warrant share.

94.     The January 3 notice, based on a closing price $.2602 per share, sought to exchange 500,000 Warrant shares for 1,393,927 shares of common stock, approximately 2.787 shares of common stock for each Warrant share.

95.     By using the perverted Black Sholes calculation, Crede was able to obtain 3,146,944 shares of common stock via the exercise notices instead of 1,257,102 had the correct calculation been used.

96.     By manipulating TREC's stock price and using the concealed perverted formula for the calculation of the Black Sholes Value, Crede was able to almost double the number of shares of common stock it could obtain for one Warrant share.

### CREDE ASKS THE NEW YORK STATE SUPREME
### COURT TO FURTHER ITS FRAUD

97.     TREC refused to process the January exercise notices on the grounds that Crede was seeking to exercise a right to exercise a number of Series A Warrant shares greater than the 1,840,400 Series A Warrant Shares covered by the Series A Warrant and also challenged Crede erroneous calculation of the number of shares of TREC common stock that was required to be delivered using the Black Sholes Option Pricing Model.

98.     Unbeknownst to TREC at that time, Crede had still not filed any Schedule 13D disclosure. As a result of that violation of controlling law, Crede was prohibited by SEC regulations from acquiring any more shares of TREC stock.

99.     Despite knowing it was in violation of securities laws and prohibited from acquiring anymore TREC stock, Crede commenced an action in the New York State Supreme Court, New York County, captioned *Crede CG III, Ltd. v. Tanzanian Royalty Exploration Corp.*, Index No. 650298/18 (the "First New York Action"), and it moved for a preliminary injunction compelling TREC to issue the shares sought in the January exercise notices.

100.     TREC opposed the preliminary injunction motion, demonstrating that Crede was barred from acquiring anymore shares due to its willful failure to disclose its trading activity in violation of SEC Rule 13d-1, and that it was impermissibly seeking to exchange more Series A Warrant Shares than covered by the Series A Warrant.

101.     Crede voluntarily dismissed the First New York Action without prejudice following the filing of TREC's opposition papers.

**CREDE CONTINUES TO REFUSE TO DISCLOSE
ITS MANIPULATION OF TREC'S STOCK**

102.     Crede continues to purposefully fail and refuse to comply with the securities law by failing to file a Schedule 13D disclosure.

103.     On February 27, 2018, Crede sent a Series B exercise notice for the cashless exercise of 500,000 Series B Warrant Shares for 1,332,222 shares of TREC common stock using the erroneous Black Sholes calculation and without disclosing to TREC that it was not providing its legally mandated disclosure to the public markets and therefore the closing price represented in the exercise notice did not reflect the Crede's manipulation of the price.

104.     Crede's continued attempts to acquire more TREC stock despite its continued violation of securities laws in furtherance of its clear fraud demonstrates that it believes it has license to disregard the laws and regulations designed to ensure a free and fair marketplace.

105.     In furtherance of its continuing flagrant violation of the securities laws, on March 12, 2018, Crede commenced yet another action in New York State Supreme Court seeking to compel the illegal issuance of the shares pursuant to the February 27 exercise notice and again seeking preliminary injunctive relief, which TREC has opposed. That action is pending.

**SCIENTER**

106.    Crede and Wellington knew, or were reckless in not knowing, that by orchestrating the payment of unlawful sales commissions to unregistered broker dealers that Crede was obligated to pay was in fact a reduction in the purchase price for TREC common stock.

107.    In addition, Crede and Wellington knew, or were reckless in not knowing, that TREC was not aware of the changes it made to the variable inputs to the Black Sholes Option Pricing Model.  Crede and Wellington intentionally buried these changes in the definition of Black Sholes Value in Section 16 of the Warrants and at the same time continuously mislead TREC into believing that the formula would be the same, or substantially the same, as the true formula used in the Black Sholes Option Pricing Model.

108.    Crede and Wellington knew, or were reckless in not knowing, that TREC would not have agreed to the altered variable inputs to the Black Sholes Option Pricing Model if this was known to TREC and by artifice and designed concealed these changes, and the unconscionable effect such changes would have on the calculation of the number of shares issued under a cashless exercise of the Warrants.

109.    Crede and Wellington knew, or were reckless in not knowing, that concealing the changes to the variable inputs into the Black Sholes Option Pricing Model and by not disclosing the effect of these changes caused their representations made to TREC and made, or caused to be made, in the registration statement to be materially false or misleading in an effort to manipulate the number of shares that would be issued in a cashless exercise of the Warrants.

110.    Crede knew, or was reckless in not knowing, that it was withholding material information concerning its acquisition and dispositions of TREC common stock by not filing its legally mandated Schedule 13D and that the market confusion caused by their failure to make its

required disclosures was allowing it to exercise the Series A Warrants on a cashless basis using the altered variable inputs into the Black Sholes Option Pricing Model without detection.

111.     Crede knew, or was reckless in not knowing, that by concealing the information required to be disclosed in a Schedule 13D Crede  was preventing the market from having access to all material information concerning the trading in TREC's common stock which was having a material adverse effect on the closing price of TREC's common stock.

112.     Crede cannot claim ignorance as to its obligations to file a Schedule 13D as TREC demonstrated that it had impermissibly failed to do so via the papers TREC filed in the New York Action.

113.     Additionally, Crede has filed Schedule 13D disclosures previously in connection with other transactions and is obviously aware of its obligations.

114.     Crede knew, or was reckless in not knowing, that it was not eligible to file a Schedule 13G and an amended Schedule 13G on March 23, 2018, and that its calculation of beneficial ownership of TREC common stock was materially understated.

115.     Peizer and Wachs exercise control over Crede and directly participated in Crede's violation of its disclosure obligations and its ongoing fraud.

116.     Peizer is the managing member of CREDE and executed all of the exercise notices issued in the course of Crede's fraudulent scheme to amass TREC stock.

117.     Wachs is a "de facto" managing member of Crede and on information and belief he is a controlling executive officer of Crede, and he has exercised Crede's power and control over the nature, extent and timing of Crede's exercise of the Warrants in written communications with TREC.

**APPLICABILITY OF PRESUMPTION OF RELIANCE:**
**FRAUD-ON-THE-MARKET DOCTRINE**

118.    At all relevant times, the market for TREC common stock was an efficient market for the following reasons, among others:

      a.   TREC's common stock met the requirements for listing, and was listed and actively traded on the NYSE American, a highly efficient market;

      b.   At all relevant times, TREC stock was actively traded, demonstrating a very strong presumption of an efficient market;

      c.   As a regulated issuer, TREC filed with the SEC certain period public reports and all persons who beneficially own more than five percent of TREC's common stock are required to disclose the nature and extent of their beneficial ownership and all subsequent purchases and sales of TREC common stock;

119.    As a result of the foregoing, the market for TREC's common stock promptly digested current information regarding TREC from all publicly available sources and reflected such information in TREC's common stock price.

120.    Accordingly, TREC reasonably relied on its market price reflecting all current information that was legally mandated to be disclosed from all available sources in agreeing to process the exercise notices delivered by Crede seeking to purchase certain shares based on the then market price of TREC stock.

**Count I**
**Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5 Against All Defendants**

121.    TREC repeats each and every allegation stated in paragraphs 1 through 86 as if set forth at length herein.

122.    Defendants, individually or in concert, by the use of means or instrumentalities of interstate commerce and of the United States mails: (i) employed devices, schemes, and artifices to defraud; (ii) intentionally omitted to state material facts necessary to not mislead TREC and the market as to its trading activities; (iii) deceived TREC as alleged above; and (iv) harmed TREC by causing a $56,000,000 decrease in its market capitalization

123.    Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact or omitted to state material facts necessary which resulted in the closing stock price in the exercise notices to be materially misleading; and/or (iii) engaged in the acts, practices, and course of conduct alleged herein that operated as a fraud or deceit upon TREC.

124.    Defendants had actual knowledge of their misrepresentations and omission of material facts relating to the payment of unlawful sales commissions to unlicensed broker dealers on behalf of Crede and of the application of the Black Sholes Value to the cashless exercise of the Warrants and of the closing stock price listed in the exercise notices or acted with reckless disregard for the truth in that they failed to disclose such material facts, even though such facts were readily available and known to them. Defendants' material misrepresentations and omissions were made knowingly or recklessly for the purpose of furthering its fraudulent scheme to mislead TREC into believing that the cashless exercise of the Warrants was using the commonly accepted application of the Black Sholes Option Pricing Model and to manipulate and depress TREC's stock price in order to amass a greater number of shares of TREC common stock than it was otherwise entitled to.

125.    TREC was in the position of seller with respect to selling shares of TREC common stock  upon receipt of each exercise notice for the Series A Warrants. As such,  TREC has standing

under Section 10(b) and SEC Rule 10b-5 to recover monetary damages as a result of Crede's and Wellington's fraud.

126.     As a result of Crede's and Wellington's material misrepresentations and omissions, TREC has been damaged in an amount to be determined based upon the $56,000,000 decrease in its market capitalization.

127.     TREC is entitled to (i) a declaration that Defendants violated Section 10(b) and SEC Rule 10b-5; and (ii) monetary damages in an amount to be determined at trial.

**Count II**
**Violation of Section 20(a) of the Exchange Act Against Defendants Peizer and Wachs**

128.     TREC repeats and realleges each and ever allegations stated in paragraphs 1 through 93 as if set forth herein at length.

129.     Peizer and Wachs acted as controlling persons of Crede.  Peizer acted as its Managing Member and Wachs acted as a "de faccto" managing member and an executive officer exercising a similar degree of control over the misrepresentations and omission made by Crede. All exercise notices were signed, reviewed and issued at the direction of Peizer with the concurrence and communication by Wachs.  Substantially all communications between TREC and Crede were made by Wachs in his role as a controlling person.  Peizer and Wachs had the power to control or influence and did in fact control and influence the particular acts of Crede giving rise to the securities violations alleged and described above.

130.     As controlling persons of Crede, Peizer and Wachs are liable pursuant to Section 20(a) of the Exchange Act for Crede's violations.

**Count III**
**Violation of Section 13(d) of the Exchange Act and SEC Rule 13d-1 Against Crede, Peizer and Wachs.**

131.    TREC repeats and realleges each and every allegation stated in paragraphs 1 through 95 as if set forth herein at length.

132.    In violation of Section 13(d) of the Exchange Act and SEC Rule 13d-1, Crede has failed to file a Schedule 13D disclosure disclosing its greater than 5% beneficial ownership interest in TREC. Crede has further failed to file Schedule 13D disclosures disclosing its trading activity wit respect to the TREC shares it has acquired.

133.    Defendants Peizer and Wachs have failed to cause Crede to file a Schedule 13D disclosure.

134.    As explained above, Crede had an obligation to file a Schedule 13D to disclose its greater than 5% beneficial ownership interest in TREC and its trading activity with respect to its acquisitions and dispositions of TREC common stock.

135.    Crede's failure to file a Schedule 13D deprives TREC and its shareholders and the marketplace of the full and accurate information to which they are entitled and both TREC and its shareholders will be irreparably harmed by the continued failure of Crede to file its Schedule 13D.

136.    In addition, on March 23, 2018, Crede filed an erroneous Schedule 13G falsely attesting that it's investment in TREC was not intended to influence control of TREC when in fact Crede controls all "Fundamental Transactions" of TREC.  Furthermore, the erroneous Schedule 13G and the amended Schedule 13G materially misrepresents the amount of shares of TREC common stock beneficially owned by Crede as calculated under SEC Rule 13d-3.

137.    Accordingly, TREC is entitled to (i) a declaration that Defendants violated Section 13(d) and Sec Rules 13d-1; (ii) an order requiring Crede to file the full and accurate disclosures

required by Section 13(d) and SEC Rule 13d-1; (iii) an order enjoining Defendants from any trading in TREC stock until they file the full and accurate disclosures required by Section 13(d) and SEC Rule 13d-1; (iv) an order enjoining Defendants from acquiring any additional TREC stock or serving any further exercise notices; and (v) a permanent injunction preventing Defendants from making any misstatements or omissions in connection with, or otherwise related to, their Schedule 13D filings.

138.    TREC has no adequate remedy at law.

### Count IV
### Breach of Contract Against Crede

139.    TREC repeats and realleges each and every allegations stated in paragraphs 1 through 103 as if set forth herein at length.

140.    TREC and Crede entered into the SPA pursuant to which TREC agreed to sell and Crede agreed to buy certain shares of TREC stock.

141.    In §4(p) of the SPA, Crede made the affirmative covenant that [f]or so long as the Buyer or any of its Affiliates holds any Securities, neither Buyer nor any Affiliate will: …(ii) engage or participate in any actions, plans or proposals which relate to or would result in …(h) causing a class of securities of the Company to be delisted from a national securities exchange or to cease to be authorized to be quoted in an inter-dealer quotation system of a registered national securities association.

142.    As described herein, Crede failed, and continues to fail, to file a Schedule 13D or 13G disclosure disclosing its beneficial ownership interest of greater than 5% in TREC stock which has the effect of concealing its trading activity from TREC, TREC's shareholders, and the markets.

143.    As described herein, Crede is engaged in a fraudulent scheme to manipulate and drive down TREC's stock price in order to acquire a greater number of shares via cashless warrant exercise.

144.    Crede's conduct has resulted in TREC's stock price declining over 60% and it is now in danger of being delisted by the NYSE and losing financing commitments and opportunities.

145.    As a result of the foregoing, Crede has materially breached the SPA resulting in harm to TREC.

146.    TREC has performed all of its obligations under the SPA.

147.    Judgment should be awarded to TREC in an amount to be determined based on Crede's breach of contract, with interest from the date of the breach.

**Count V**
**Breach of Implied Duty of Good Faith and Fair Dealing Against Crede**

148.    TREC restates each and every allegation stated in paragraphs 1 through 112as if set forth herein at length.

149.    A duty of good faith and fair dealing is implied in the SPA and the Warrants.

150.    Crede breached its implied duty of good faith and fair dealing by (i) intentionally concealing its trading activity and beneficial ownership by virtue of its willful violation of Section 13d and SEC Rule 13d-1 by not filing the required Schedule 13D; (ii) applying an unconscionable and incorrect Black Sholes method of calculation of cashless exercise under the Warrant which led to it obtaining a far greater number of TREC stock than intended by the parties' agreement and which was done with the intent to further rive down TREC's stock price; and (iii) engaging in the fraudulent scheme described herein to manipulate and drive down TREC's stock price.

151.    TREC has performed all of its obligations under the SPA and Warrants.

152.    As a result of Crede's breach of the implied duty of good faith and fair dealing under the SPA and Warrants, TREC is entitled to judgment in an amount to be determined, with interest from the date of the breach.

**REQUEST FOR RELIEF**

WHEREFORE, TREC respectfully requests judgment against Defendants as follows:

(a)      Declaring and determining that Defendants violated Sections 10(b) and 13(d) of the Exchange Act and SEC Rules 10b-5 and 13d-1 through their actions as alleged and described above;

(b)      Directing Crede to file with the Securities and Exchange Commission complete and accurate disclosures required by Section 13(d) of the Securities Exchange Act of 1934 in connection with Crede's acquisition and disposition of securities of TREC;

(c)      Awarding temporary equitable and injunctive relief and preliminarily enjoining Defendants from any trading in TREC stock, acquiring additional TREC stock, or serving any further exercise notices for the exchange of Series A or Series B Warrants until the file the full and accurate disclosures required by Section 13(d) and SEC Rule 13d-11;

(d)      Awarding equitable and injunctive relief and permanently enjoining Defendants from making any misstatements or omissions in connection with, or otherwise related to, Crede's Schedule 13D filings;

(e)      Awarding TREC damages in an amount to be determined for Defendants' violation of Section 10(b) and Sec Rule 10b-5 through their actions as alleged and described above with interest;

(f)      Declaring and determining that Crede has breached its express covenants in the SPA;

(g)      Awarding TREC damages in an amount to be determined for Crede's material breach of the SPA and material breach of the implied covenants of good faith and fair dealing with interest;

(h)      Awarding TREC its costs and disbursements in this action, including reasonable attorneys' fees; and

(i)      Granting TREC such other and further relief as this Court may deem just and proper.

Dated: New York, New York
       May 9, 2018

                                    **LEWIS BRISBOIS BISGAARD & SMITH LLP**

                              By: /s/Peter T. Shapiro
                                   Peter T. Shapiro, Esq.
                                   Brian Pete, Esq.
                                   *Attorneys for Plaintiff*
                                   77 Water Street, Suite 2100
                                   New York, New York  10005
                                   Tel: 212-232-1300
                                   Peter.Shapiro@lewisbrisbois.com
                                   Brian.Pete@lewisbrisbois.com