UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 3/26/2019___

------------------------------------------------------- X
                                                        :
TANZANIAN ROYALTY EXPLORATION                           :
CORP.,                                                  :
                                    Plaintiff,          :        18 Civ. 4201 (LGS)
                                                        :
                -against-                               :        **OPINION AND ORDER**
                                                        :
CREDE CG III, LTD., et al.,                             :
                                    Defendants.         :
                                                        :
------------------------------------------------------- X

LORNA G. SCHOFIELD, District Judge:

Plaintiff Tanzanian Royalty Exploration Corporation ("TREC") brings this action against

Defendants Crede CG III, Ltd., ("Crede"), Wellington Shields & Co. LLC ("Wellington"),

Terren Peizer and Michael S. Wachs, alleging violations of the Securities and Exchange Act of

1934 (the "Exchange Act") and various state common law claims. Defendants move to dismiss

the First Amended Complaint (the "Complaint") pursuant to Federal Rule of Civil Procedure

12(b)(6). For the reasons stated below, Defendants Wellington, Peizer, and Wachs are dismissed

from the case. Crede's motion to dismiss is granted in part and denied in part.

## I. BACKGROUND

The facts below are taken from the Complaint, documents incorporated in the complaint

by reference, and matters of which judicial notice may be taken. *See TCA Television Corp. v.*

*McCollum*, 839 F.3d 168, 172 (2d Cir. 2016). These facts are assumed to be true only for

purposes of this motion. *See Doe v. Columbia Univ.*, 831 F.3d 46, 48 (2d Cir. 2016).

### A. The Parties and Their Introduction

Plaintiff TREC is a mineral resource company engaged in the exploration and

development of natural resource properties in the United Republic of Tanzania. Its shares are

traded on the NYSE American Stock Exchange ("NYSE"). Defendant Wellington is a registered broker-dealer. Crede is a Bermuda investment firm with its principal place of business in Los Angeles.

In the summer of 2016, Filip Kisin, on behalf of Wellington, informed TREC through an unsolicited phone call that Wellington might have potential investors interested in investing in TREC. In August 2016, TREC's Executive Chairman, James A. Sinclair, met with Wellington representatives, who informed Sinclair that Defendant Crede was prepared to invest $5 million in TREC and produced a term sheet detailing the terms of the proposed investment. Defendant Wachs is a principal of Crede and coordinated Crede's negotiations through Wellington with TREC. Prior to Kisin's initial phone call, TREC did not have a relationship with Wellington, Kisin, Crede, Wachs or Peizer, who is also a principal of Crede.

### B. The Parties' Agreements

#### 1. The Securities Purchase Agreement

On September 1, 2016, TREC and Crede entered into a securities purchase agreement (the "SPA"). Pursuant to the SPA, Crede agreed to make a two-tranche investment in TREC totaling $5 million in exchange for TREC common stock, convertible notes and warrants.

#### a. The Investments

Under the first tranche of the investment, which closed on September 1, 2016, Crede purchased 1,840,400 shares of TREC common stock and a warrant (the "Series A Warrant") to purchase an additional 1,840,400 shares of TREC common stock at an exercise price of $0.8291 per share. The terms to exercise the warrant are outlined in the Series A Warrant attached to the SPA as Exhibit A.

Under the second tranche of the investment, which closed on September 26, 2016, in exchange for $3,750,000, Crede purchased a convertible note, which immediately converted into 5,357,143 shares of TREC common stock, and warrant (the "Series B Warrant") to purchase 4,017,857 shares of TREC common stock at an exercise price of $1.10 per share. The Series B Warrant contains the terms on which it can be exercised and is attached to the SPA as Exhibit B. Sinclair, TREC's CEO signed the SPA and separately signed the Series A and Series B Warrants (collectively, the "Warrants").

### b. The Cashless Exercise Option

The Warrants provide two ways to purchase shares: first, Crede could exchange warrant shares for the right to purchase the same number of shares of TREC common stock at the applicable exercise price (the "Cash Exercise"); second, in the event that TREC's stock price fell below the exercise price in the Warrants, Crede could invoke the cashless exercise option (the "Cashless Exercise") -- i.e., convert warrant shares into common stock at a price determined by a formula in § 1(d) of the Warrants, one variable of which is the "Black Scholes Value" ("Conversion Formula").[1] "Black Scholes Value" is defined in the Warrants:

> **"Black Scholes Value"** means the Black Scholes value of an option for one share of Common Stock at the date of the applicable Cashless Exercise, as such Black Scholes value is determined, calculated using the Black Scholes Option Pricing Model obtained from the "OV" function on Bloomberg utilizing (i) an underlying price per share equal to the Exercise Price, (ii) a risk-free interest rate corresponding to the U.S. Treasury rate, (iii) a strike price equal to the Exercise Price in effect at the time of the applicable Cashless Exercise, (iv) an expected volatility equal to 135%, and (v) a deemed remaining term of the Warrant of five (5) years (regardless of the actual remaining time of the Warrant).

---

[1] The Conversion Formula is: A x B/C, where A is "the total number of warrant shares with respect to which the warrant is being exercised," B is the "Black Scholes Value (as defined in Section 16 [of the Warrants])", and C is "the Closing Bid Price of the Common Stock as of two (2) Trading Days prior to the time of such exercise."

### c. Ownership and Control

The SPA limits the total shares of TREC common stock that Crede can acquire to 9.9% of the issued and outstanding shares. In § 4(p) of the SPA, Crede agrees not to engage in any activities that result in certain organizational and other changes to TREC.[2] The SPA and Warrants also restrict TREC's right to enter into a "Fundamental Transaction," defined in the Warrants as actions by TREC that result in a merger; the disposal of all its assets; or an entity obtaining 50% of its voting stock.

### d. Integration Clause

Section 9(e) of the SPA is an integration clause, which states, "This Agreement, the other Transaction Documents and the schedules and exhibits attached hereto . . . supersede all other prior oral or written agreements between the Buyer [and] the Company." Section 9(e) also limits the parties' representations to those set forth in the SPA: "Except as specifically set forth herein

---

[2] Section 4(p) states: "**Activity Restrictions.** For so long as the Buyer or any of its Affiliates holds any Securities, neither the Buyer nor any Affiliate will: (i) vote any shares of Common Stock owned or controlled by it, solicit any proxies, or seek to advise or influence any Person with respect to any voting securities of the Company; (ii) engage or participate in any actions, plans or proposals which relate to or would result in (a) acquiring additional securities of the Company, alone or together with any other Person, which would result in beneficially owning or controlling, or being deemed to beneficially own or control, more than 9.9% of the total outstanding Common Stock or other voting securities of the Company, (b) an extraordinary corporate transaction, such as a merger, reorganization or liquidation, involving Company, (c) a sale or transfer of a material amount of assets of the Company, (d) any change in the present board of directors or management of the Company, including any plans or proposals to change the number or term of directors or to fill any existing vacancies on the board, (e) any material change in the present capitalization or dividend policy of the Company, (f) any other material change in the Company's business or corporate structure, (g) changes in the Company's charter, bylaws or instruments corresponding thereto or other actions which may impede the acquisition of control of the Company by any Person, (h) causing a class of securities of the Company to be delisted from a national securities exchange or to cease to be authorized to be quoted in an inter-dealer quotation system of a registered national securities association, . . . ."

or therein, neither the Company nor Buyer makes any representation, warranty, covenant or undertaking with respect to such matters."

## 2.  Registration Rights Agreement

TREC and Crede also entered into a Registration Rights Agreement ("Registration Agreement") in which TREC agreed to file a registration statement ("Registration Statement") with the Securities and Exchange Commission ("SEC") to register the shares and Warrants issuable on the date of filing the Registration Statement.  Registering the securities allowed Crede to resell the securities.  The Registration Agreement permitted Crede to select legal counsel "to review and oversee, solely on its behalf, any registration" under the agreement.

## 3.  Placement Agent Agreement

TREC and Wellington entered into a Placement Agent Agreement ("PAA") in which TREC agreed to engage Wellington as its "exclusive placement agent" for Crede's investment in TREC.  TREC agreed to pay Wellington a commission.  The PAA states that "the Placement Agreement shall comply with all applicable broker-dealer registration requirements . . . and all Financial Industry Regulatory Authority . . . regulations."

## C.  Negotiations Regarding the SPA

When the parties negotiated the SPA, Crede stated that the "Black Scholes model" would be used as an input in the Conversion Formula.  TREC understood these references to mean that the parties would use the Black Scholes Option Pricing Model ("Standard Black Scholes Model"), a common formula used to determine the fair price of an option using the current market value of the shares underlying the option.

However, despite representing that it would use the "Black Scholes model" during negotiations, the Black Scholes Value as defined in the SPA contained three inputs that differed

from those in the Standard Black Scholes Model.[3]  TREC did not understand, and Crede did not

disclose, that the definition in the Warrants differed from the Standard Black Scholes Model.

During the negotiations, Sinclair on behalf of TREC stated that he would never agree to a

cashless exercise provision that would result in a "toxic warrant," and the SPA included Crede's

covenant not to engage in actions that would "caus[e] a class of securities of . . . [TREC] to be

delisted from a national securities exchange."

     **D.**     **Events Post-dating the SPA and the PAA**

          **1.**     **Filing of the Registration Statement**

On September 12, 2016, TREC filed with the SEC its Registration Statement signed by

Sinclair.  Under the heading "Prospectus Summary," the filing summarizes the terms of the SPA,

including the methods by which Crede could exercise the Warrants.  The Registration Statement

states that the Warrants are exercisable immediately for cash, or "where the exercise price is

higher than the then-current market price of the common shares, on a cashless exercise basis,

using the Black Scholes Value."  Two paragraphs later, the Registration Statement qualifies its

summary: "[t]he entire discussion regarding the [SPA], Notes, [and] Warrants . . . is qualified in

its entirety to such agreements which have been filed with the SEC on September 7, 2016, as

exhibits on Form 6-K."  TREC's Form 6-K filings include the SPA and Warrants as exhibits.

Crede was jointly responsible for preparing this portion of the Registration Statement, but failed

to disclose deviations from the Standard Black Scholes Model.

---

[3] Specifically, the first variable input in the Standard Black Scholes Model was changed from "current market price of the security covered by the option" to the exercise price of the option. Second, instead of using TREC's actual volatility, the Black Scholes Value included a standard volatility rate of 135%.  Finally, the Black Scholes Value used a fixed five-year term, rather the time remaining to exercise the option as the last input.

### 2. Crede's Resale of TREC Common Stock

After the Registration Statement became effective, Crede began selling substantial quantities of stock it purchased pursuant to the SPA, causing the price of TREC common stock to drop. On September 8, 2016, one week after the first tranche closed, TREC's common stock was trading at $1.05 per share. However, on January 6, 2017, TREC's stock price closed at $0.56 per share.

### 3. Crede's Failure to Disclose Beneficial Ownership

Crede failed to file a timely Schedule 13D or Schedule 13G after any of its transactions converting Warrants to TREC common stock in 2017 to disclose that it had acquired a greater-than-5% beneficial ownership interest in TREC. An investor who acquires beneficial ownership of more than 5% of a voting class of a company's securities is required to file a Schedule 13D within 10 days of the acquisition. 17 C.F.R. § 240.13d-1. Rule 13d-1 allows purchasers to file a Schedule 13G in lieu of a Schedule 13D form when the purchaser "has not acquired the securities with any purpose, or with the effect, of changing or influencing the control of the issuer." 17 C.F.R. § 240.13d-1(c). The investor is required to amend the Schedule 13D promptly if it materially increases or decreases the percentage of shares held. 17 C.F.R. § 240.13d-2(a).

### 4. Crede's Exercise of the Warrants

On April 17, 2017, May 8, 2017, July 17, 2017, and August 21, 2017, TREC issued common stock to Crede responding to four exercise notices Crede delivered for a Cashless Exercise of Series A Warrant shares.

On January 3 and 5, 2018, Crede attempted to exercise more Series A Warrants. As a result of these notices, TREC discovered that Crede was attempting to exercise more Series A

Warrant shares than specified in the Series A Warrant.  TREC also discovered that the Black Scholes Value in the SPA contained inputs different than the Standard Black Scholes Model. TREC refused to process the January 2018 exercise notices because of these two discoveries.  On February 27, 2018, Crede attempted to exercise 500,000 Series B Warrants using the Cashless Exercise.  TREC refused to process the exercise notice.  On March 12, 2018, Crede commenced an action in New York State Supreme Court seeking to compel TREC to issue the shares.

### 5.  Crede's Schedule 13G Filings

On March 23, 2018, Crede filed an untimely Schedule 13G and an Amended Schedule 13G.  The first form was filed in response to the "closing of the second tranche of financing on September 26, 2016, pursuant to the Securities Purchase Agreement."  Under the heading "Aggregate Amount Beneficially Owned," the Schedule 13G states that as of September 26, 2016, the date on which the second tranche closed, Crede beneficially owned 9.99% of TREC common stock.  The Schedule 13G notes that Crede beneficially owned 9.99% of TREC common stock because the Warrants "are each subject to a 9.99% blocker, and the percentage . . . gives effect to such blockers."

On the same day, March 23, 2018, Crede filed an Amended Schedule 13G in response to Crede's sale of TREC stock and the first Cashless Exercise notice on March 7, 2017.  The Amended Schedule 13G indicates (by checking the appropriate box) that, as of March 7, 2017, "the reporting person [Crede] has ceased to be the beneficial owner of more than 5 percent of the class of securities" and states that Crede is the beneficial owner of 4.87% of TREC common stock.

### 6.  Effect on TREC's Common Stock

Since entering into the SPA and the PAA in September 2016, TREC's stock price

declined over 60%, TREC's common stock was in danger of being delisted by the NYSE, and TREC was in danger of losing financing commitments and opportunities.

### 7. Payment of Unlawful Commissions

The Complaint also alleges the unlawful payment of commissions to unlicensed broker-dealers. Wellington paid a portion of its commission under the PAA to Kisin, who was not a licensed broker-dealer, in exchange for his initial solicitation of TREC in August 2016. Similarly, the fee paid to Crede's advisor under the SPA[4] was paid to Jess Mogul, who also was not a licensed broker-dealer.[5] TREC was not aware that the commission and fees it paid would be shared with people who were not licensed, in violation of applicable securities laws.

## II. STANDARD

### A. 12(b)(6)

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly,* 550 U.S. at 556). It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge[]" claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. "To survive dismissal, the plaintiff must provide the

---

[4] Section 1(g) states, "Payment of Fees. On the Closing Date of the First Closing, the Company [TREC] shall pay an amount in cash equal to five percent (5%) of the applicable Purchase Price for the First Closing to Persons engaged by Buyer [Crede] or its investment advisor, relating to arising out of the transactions contemplated hereby, as set forth on the Buyer Schedule."

[5] The Complaint incorrectly identifies the solicitor as "Josh" Mogul.

grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly,* 550 U.S. at 555). On a Rule 12(b)(6) motion, "all factual allegations in the complaint are accepted as true and all inferences are drawn in the plaintiff's favor." *Apotex Inc. v. Acorda Therapeutics, Inc.*, 823 F.3d 51, 59 (2d Cir. 2016) (quoting *Littlejohn v. City of N.Y.*, 795 F.3d 297, 306 (2d Cir. 2015)).

### B.     PSLRA

"Any complaint alleging securities fraud must satisfy the heightened pleading requirements of [the Private Securities Litigation Reform Act (the "PSLRA")] and Fed. R. Civ. P. 9(b) by stating with particularity the circumstances constituting fraud." *Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford*, 794 F.3d 297, 304 (2d Cir. 2015) (quoting *ECA, Local 134 IBEW Joint Pension Tr. of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 196 (2d Cir. 2009)). Under Rule 9, "[a] securities fraud complaint [based on misstatements] must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Charles Schwab Corp. v Bank of Am. Corp.,* 883 F.3d 68, 94 (2d Cir. 2018) (internal quotation marks omitted) (quoting *Blanford*, 794 F.3d at 305). Although a claim based on market manipulation does not require the plaintiff to "plead manipulation to the same degree of specificity as a plain misrepresentation claim[,] . . . a manipulation claim must [still] plead with particularity the nature, purpose, and effect of the fraudulent conduct and the roles of the defendants." *ATSI*, 493 F.3d at 102. The PSLRA similarly requires a pleading to allege "the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on

information and belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u-4(b)(1)(B).

In considering a motion to dismiss, courts "do not look beyond 'facts stated on the face of the complaint, . . . documents appended to the complaint or incorporated in the complaint by reference, . . . matters of which judicial notice may be taken,'" and other documents "integral to the complaint." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citing *Concord Assocs., L.P. v. Entm't Props. Tr.*, 817 F.3d 46, 51 n.2 (2d Cir. 2016)) (ellipses in original). The SPA, Warrants, PAA and the Registration Rights Agreement are considered because they are integral to the Complaint. *See id.* ("A document is integral to the complaint where the complaint relies heavily upon its terms and effect.") (internal quotation marks omitted). TREC's Registration Statement and Form 6-K and Crede's Schedule 13G filings are considered because they are regulatory filings of which judicial notice may be taken. *See Staehr v. Hartford Fin. Servs. Grp., Inc.*, 547 F.3d 406, 425 (2d Cir. 2008) (taking judicial notice of regulatory filings on a motion to dismiss).

### III.    DISCUSSION

#### A.    Claims Against Peizer and Wachs

The Complaint includes three federal securities laws claims, which all include Peizer and Wachs as Defendants. The § 10(b) and § 20(a) claims fail because the Complaint makes no specific factual allegations that either Peizer or Wachs engaged in wrongdoing. *See Blanford*, 794 F.3d at 304 ("Any complaint alleging securities fraud must . . . stat[e] with particularity the circumstances constituting fraud."); *In re: EZCorp, Inc. Sec. Litigations*, 181 F. Supp. 3d 197, 212 (S.D.N.Y. 2016) (alleging scienter in the context of control person liability "requires particularized facts of the *controlling person's* conscious misbehavior or recklessness" (emphasis

in original)).  The § 13(d) claim fails because the Complaint does not allege that Peizer and

Wachs had any reporting obligation under § 13(d) -- i.e., that they beneficially owned 5% of

TREC common stock.  *See* 17 C.F.R. § 240.13d-1(a) (Any person who is "directly or indirectly

the beneficial owner of more than five percent of [a registered equity security] shall . . . file . . . a

statement containing the information required by Schedule 13D.")  Defendants Peizer and Wachs

are dismissed.

### B.      Section 10(b) Claim Based on Misrepresentation

The Complaint's § 10(b) claim based on a misrepresentation theory is dismissed.  It is

dismissed against Crede because, as explained below, the Complaint fails to raise a plausible

inference that Crede's statements and omissions were materially misleading and that TREC

reasonably relied on them.  The claim against Wellington is dismissed because Plaintiff

confirmed in its opposition memorandum of law that it did not intend to proceed against

Wellington on a misrepresentation theory.

The six elements of a misrepresentation claim under § 10(b) and its implementing rule,

Rule 10b–5 are: "(1) a material misrepresentation or omission by the defendant; (2) scienter, (3)

a connection between the misrepresentation or omission and the purchase or sale of a security;

(4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation."

*Erica P. John Fund, Inc. v. Halliburton Co.*, 563 U.S. 804, 810 (2011); *accord Ind. Pub. Ret.*

*Sys. v. SAIC, Inc.*, 818 F.3d 85, 93 (2d Cir. 2016).  The first and fourth elements are addressed

below.

### 1.   Black Scholes Value

### a.   Misrepresentation or Omission

"[Section] 10(b) and Rule 10b–5(b) do not create an affirmative duty to disclose any and

all material information." *Matrixx Initiatives, Inc. v. Sircusano*, 563 U.S. 27, 44 (2011). Under

Rule 10b–5, it is unlawful to (1) "make any untrue statement of a material fact," or (2) "omit to

state a material fact necessary in order to make the statements made . . . not misleading." *In re*

*Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239 (2d Cir. 2016) (quoting 17 C.F.R. § 240.10b–5(b)).

"Rule 10b-5 expressly requires an actual *statement*, one that is either untrue outright or

misleading by virtue of what it omits to state. Absent an actual statement, a complete failure to

make a statement -- in other words, a pure omission -- is actionable under the securities laws

only when the corporation is subject to a duty to disclose the omitted facts." *Id.* (internal

citations and quotation marks omitted). The inquiry is "whether the disclosures and

representations, taken together and in context, would have misled a reasonable investor about the

nature of the securities." *In re ProShares Tr. Sec. Litig.*, 728 F.3d 96, 103 (2d Cir. 2013)

(internal alterations and quotation marks omitted).

 A statement or omission is material when there is "a substantial likelihood that the

disclosure of the omitted fact would have been viewed by the reasonable investor as having

significantly altered the total mix of information made available" to the market. *IBEW Local*

*Union No. 58 Pension Tr. Fund & Annuity Fund v. Royal Bank of Scot. Grp., P.L.C.*, 783 F.3d

383, 390 (2d Cir. 2015) (internal quotation marks and citations omitted). "To be material within

the meaning of § 10(b), the alleged misstatement must be sufficiently specific for an investor to

reasonably rely on that statement as a guarantee of some concrete fact or outcome which, when it

proves false or does not occur, forms the basis for a § 10(b) fraud claim." *City of Pontiac*

*Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 185 (2d Cir. 2014) (internal

quotation marks omitted).

 The Complaint alleges that Crede misrepresented the formula that would be used to

calculate the Cashless Exercise by representing that the "Black Sholes model" would be used during negotiations and failing to disclose that it altered three inputs to the Standard Black Scholes Model in the SPA and in the portion of TREC's Registration Statement it helped prepare. These statements and omissions do not support a misrepresentation claim because the Warrants attached to the SPA -- which both Plaintiff and Crede signed -- defined the term "Black Scholes Value" with the specific inputs that would be used to calculate the formula's output value. As Crede's representations "taken together and in context," *see Vivendi*, 838 F.3d at 250, include an oral representation to use the "Black Scholes model" and a contract term identifying the inputs used to calculate that value, a reasonable issuer and party to the agreement would not have been misled into thinking Crede used the Standard Black Scholes Model. *See Ashland Inc. v. Morgan Stanley & Co.*, 652 F.3d 333, 337–38 (2d Cir. 2011) (the plaintiffs' complaint failed to state a claim when an "SEC-mandated statement explicitly disclosed the very liquidity risks about which [plaintiffs] claim to have been misled").

Plaintiff argues that disclosing the altered inputs in the SPA does not cure the misleading nature of Crede's prior statements because Plaintiff's "mistake in failing to discover the offending terms was fraudulently induced." This argument is rejected. Plaintiff had a duty to read the contract before agreeing to it. *See Gold v. Deutsche Aktiengesellschaft*, 365 F.3d 144, 149 (2d Cir. 2004) (noting that "a party who signs or accepts a written contract . . . is conclusively presumed to know its contents and to assent to them" (internal quotation marks omitted)). If Plaintiff failed to do so, then it is Plaintiff's negligence and not any alleged fraud that caused Plaintiff's injury. A reasonable issuer in TREC's position would not have been misled by Crede's references to the "Black Scholes model" and the Registration Statement's reference to the "Black Scholes Value" when the precise terms of the formula were set forth in

the parties' agreement.  *In re Pretium Res. Inc. Sec. Litig.*, 256 F. Supp. 3d 459, 476 (S.D.N.Y.

2017), *aff'd sub nom. Martin v. Quartermain*, 732 F. App'x 37 (2d Cir. 2018) (holding that the

complaint failed to state a § 10(b) claim when "the same documents on which the [complaint]

relie[d] for the purported misstatements disclose[d] the information [p]laintiffs claim . . .

[defendant] to have omitted").

The Complaint alleges that Crede should be liable under § 10(b) for a failure to explain in

TREC's own Registration Statement the term "Black Scholes value" as used in the parties'

agreement.  This argument borders on ridiculous.  As the Registration Statement is TREC's own

filing with the SEC, TREC is responsible for ensuring that the filing is accurate.  Indeed, § 11 of

the Exchange Act "imposes strict liability on issuers [TREC] and signatories [Sinclair] . . . for

material misstatements or omissions in a registration statement."  *See Fed. Hous. Fin. Agency for*

*Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 99 (2d Cir. 2017), *cert.*

*denied sub nom. Nomura Sec. Int'l, Inc. v. Fed. Hous. Fin. Agency*, 138 S. Ct. 2679 (2018).

TREC has no basis to allege fraud against Crede for a term that TREC alleges is a misleading

statement in its own registration statement.

### b.  Reliance

For similar reasons, the Complaint fails to plead reasonable reliance -- that Plaintiff

reasonably relied on Crede's alleged misleading statements regarding the Black Scholes Value.

A § 10(b) claim must plausibly plead that "plaintiff's reliance on the defendant's

misrepresentation [was] reasonable in order for the claim to proceed.  An investor may not

justifiably rely on a misrepresentation if, through minimal diligence, the investor should have

discovered the truth."  *Ashland*, 652 F.3d at 337–38 (internal citations and quotation marks

omitted); *accord I.B. Trading, Inc. v. Tripoint Glob. Equities, LLC*, 280 F. Supp. 3d 524, 535

(S.D.N.Y. 2017). Reliance is unreasonable when a shareholder could have discovered the truth by "investigat[ing] . . . already-disclosed" materials. *Starr ex rel. Estate of Sampson v. Georgeson S'holder, Inc.*, 412 F.3d 103, 110 (2d Cir. 2005); *accord In re Pretium*, 256 F. Supp. 3d at 475. "Where the plaintiff is a sophisticated investor and an integrated agreement between the parties does not include the misrepresentation at issue, the plaintiff cannot establish reasonable reliance on that misrepresentation." *See ATSI*, 493 F.3d at 105.

First, the Complaint fails to allege reasonable reliance because the altered inputs to the Standard Black Scholes Model were disclosed in the SPA and the attachments to TREC's own Form 6-K. TREC had every opportunity to access the relevant information and detect the fraud. *See Ashland*, 652 F.3d at 338 (the plaintiffs' complaint failed to allege reasonable reliance when an "SEC-mandated statement explicitly disclosed the very liquidity risks about which [plaintiffs] claim to have been misled").[6]

Second, § 9(e) of the SPA includes an integration clause, which states, "This Agreement, the other Transaction Documents and the schedules and exhibits attached hereto . . . supersede all other prior oral or written agreements between the Buyer [and] the Company" and "[e]xcept as

---

[6] Citing *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 153 (1972), Plaintiff argues that "proof of reliance is not a prerequisite to recovery in a case involving an omission of material fact by one under an obligation to provide it." However, the *Ute* presumption of reliance does not apply to representations regarding the Standard Black Scholes Model because the Complaint alleges affirmative misleading statements: Crede's references to the "Black Scholes model" during negotiations and the reference to the "Black Scholes Value" in TREC's Registration Statement. *See, e.g., Waggoner v. Barclays PLC*, 875 F.3d 79, 96 (2d Cir. 2017), *cert. denied*, 138 S. Ct. 1702 (2018) ("Plaintiffs' complaint alleges numerous affirmative misstatements by the Defendants. The Plaintiffs are therefore not in a situation in which it is impossible for them to point to affirmative misstatements."). As for the Complaint's omission claim, even if actual reliance is presumed under *Ute*, the Complaint's allegations of reliance must be reasonable for the claim to proceed. *See, e.g., Walsh v. Rigas*, No. 17 Civ. 4089, 2019 WL 294798, at *7 (S.D.N.Y. Jan. 23, 2019) (dismissing 10(b) omission claim for failure to plead that reliance was reasonable).

specifically set forth herein . . . , neither the Company nor Buyer makes any representation, warranty, covenant or undertaking with respect to such matters." This clause defeats Plaintiff's claim of reasonable reliance. *See, e.g., One Commc'ns Corp. v. JP Morgan SBIC LLC*, 381 F. App'x 75, 79 (2d Cir. 2010) (holding that a reasonable investor failed to plead reliance when the parties' contract contained a provision "specifically disclaiming the ability . . . to rely on representations or warranties that were 'inconsistent with or in addition to the representations and warranties' set forth in the agreement'").

### 2. Unlicensed Payments to Broker-Dealers

The Complaint alleges that Crede is liable under § 10(b) for its failure to disclose to TREC the payment of unlawful sales commissions to two unlicensed broker-dealers. This claim fails. Section 10(b) does "not create an affirmative duty to disclose any and all material information." *Matrixx*, 563 U.S. at 44. The Complaint does not allege that Crede had a duty to disclose who shared in the commissions that TREC paid to Crede and Wellington and whether they were licensed broker-dealers. The Complaint also does not identify any affirmative statement by Crede that was misleading in light of Crede's failure to disclose. *See Vivendi*, 838 F.3d at 239 (absent an omission when under a "duty to disclose the omitted facts," "Rule 10b–5 expressly requires an actual *statement*, one that is either 'untrue' outright or 'misleading' by virtue of what it omits to state").[7]

### C. Section 10(b) Market Manipulation Claim

The Complaint states a § 10(b) market manipulation claim against Crede. "Section 10(b), in proscribing the use of a 'manipulative or deceptive device or contrivance,' [15 U.S.C] §

---

[7] Even if TREC could establish a duty to disclose, the Complaint does not allege -- and likely cannot allege -- how TREC was injured by the omission.

78j(b), prohibits not only material misstatements but also manipulative acts." *ATSI*, 493 F.3d at 99; *accord ECD Inv'r Grp. v. Credit Suisse Int'l*, No. 14 Civ. 8486, 2017 WL 3841872, at \*25 (S.D.N.Y. Sept. 1, 2017). A "valid securities-manipulation claim[] under Section 10(b) must allege: "(1) manipulative acts; (2) damage; (3) caused by reliance on an assumption of an efficient market free of manipulation; (4) scienter; (5) in connection with the purchase or sale of securities; (6) furthered by the defendant's use of the mails or any facility of a national securities exchange." *ATSI*, 493 F.2d at 101. "[M]anipulation violates Section 10(b) when an artificial or phony price of a security is communicated to persons who, in reliance upon a misrepresentation that the price was set by market forces, purchase the securities." *Fezzani v. Bear, Stearns & Co. Inc.*, 716 F.3d 18, 25 (2d Cir. 2013).

The Complaint alleges that Crede attempted to obtain influence or control over TREC by engaging in the following manipulative scheme: first, Crede altered inputs to the Standard Black Scholes Model used in the SPA. Second, Crede engaged in manipulative sales; soon after it purchased the first tranche of securities, Crede sold large quantities of TREC common stock with the intent and effect of driving down the market price, thereby enabling Crede to increase the number of shares it could obtain pursuant to the Cashless Exercise. Finally, Crede concealed its manipulative conduct by failing to file the required Schedules 13D with TREC and the SEC, which would have disclosed that Crede had purchased and sold millions of shares of TREC common stock. The Complaint alleges that "[b]y failing to file a Schedule 13D, Crede misrepresented to the market that TREC common stock was worth much less than the market had, to that time, valued it."

The Complaint's allegations regarding the Black Scholes Value are baseless for the reasons discussed above, and are therefore disregarded in the analysis of market manipulation

below.  Similarly, the Complaint's allegation that Crede's scheme was motivated by its intent to control TREC is disregarded.  The assertion is implausible in light of the SPA's limits on Crede's accumulation of TREC stock and restrictions on Crede exercising control.

### 1.  Manipulative Acts

To plead manipulative acts, the Complaint must allege that defendants engaged in "market activity aimed at deceiving investors as to how other market participants have valued a security."  *Fezzani v. Bear, Stearns & Co. Inc.*, 777 F.3d 566, 571 (2d Cir. 2015).  "The gravamen of manipulation is deception of investors into believing that prices at which they purchase and sell securities are determined by the natural interplay of supply and demand, not rigged by manipulators."  *Wilson v. Merrill Lynch & Co.*, 671 F.3d 120, 130 (2d Cir. 2011); *accord ECD Inv'r Grp.*, 2017 WL 3841872, at *25.  "In identifying activity that is outside the 'natural interplay of supply and demand,' courts generally ask whether a transaction sends a false pricing signal to the market."  *ATSI*, 493 F.3d at 100.

The Complaint pleads with sufficient particularity that Crede engaged in manipulative market activity.  The Complaint alleges that "[a]fter the registration statement was declared effective, Crede began dumping or selling substantial quantities of the TREC common stock it purchased pursuant to the SPA" and "[w]ith substantially more TREC common stock available on the market" the price "substantially fell."  Large volume sales are not inherently manipulative, but when combined with the allegation that Crede dumped TREC's stock to drive down its price and increase the number of shares it could obtain under the Cashless Exercise, the Complaint plausibly pleads "something more."  *See ATSI*, 493 F.3d at 101; *see also Sharette v. Credit Suisse Int'l*, 127 F. Supp. 3d 60, 83 (S.D.N.Y. 2015) (holding that "high-volume short selling," when "willfully combined . . . [with] a coordinated scheme engineered by the . . . [d]efendants to

use short selling to manipulate the price of [a] stock," stated a claim for market manipulation).

Here, TREC's sales "sen[t] a false pricing signal to the market" because the drop in TREC's

stock price was driven by Crede's desire to profit illegitimately from its warrant rights, rather

than a genuine decrease in market demand for TREC securities.  *See ATSI*, 493 F.3d at 101.

Although the terms under which Crede could exchange Warrants for shares were revealed

to the market in TREC's SEC filings, the Complaint alleges that Crede's failure to file timely

Schedule 13Ds "fully disclosing the sales it conducted . . . hid from both TREC and the public

market" that Crede "intended to depress the price of TREC's common stock."  *See CompuDyne*

*Corp. v. Shane*, 453 F. Supp. 2d 807, 822 (S.D.N.Y. 2006) (the complaint pleaded a

manipulative act by alleging that a broker engaged in "substantial short sales based upon non-

public information" that artificially depressed the price of an issuer's stock).

### 2.  Scienter

"Because a claim for market manipulation requires a showing of scienter, the PSLRA's

heightened standards for pleading scienter also apply."  *ATSI*, 493 F.3d at 102.  The PSLRA

requires a plaintiff to "state with particularity facts giving rise to a strong inference that the

defendant acted with the required state of mind."  15 U.S.C. § 78u–4(b)(2)(A).  "This standard

requires courts to take into account 'plausible opposing inferences.'"  *Matrixx*, 563 U.S. at 48

(quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 323 (2007)).  "For an

inference of scienter to be strong, 'a reasonable person [must] deem [it] cogent and *at least as*

*compelling* as any opposing inference one could draw from the facts alleged.'"  *ATSI*, 493 F.3d

at 99 (quoting *Tellabs*, 551 U.S. at 324) (alterations and emphasis in original).  In the market

manipulation context, "the complaint must plead with particularly facts giving rise to a strong

inference that the defendant intended to deceive investors by artificially affecting the market

price of securities." *Id.* at 102. "This requirement can be satisfied by "alleging facts . . . showing that the defendants had both motive and opportunity to commit the fraud." *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 106 (2d Cir. 2015). Pleading scienter "is particularly important in manipulation claims because in some cases scienter is the only factor that distinguishes legitimate trading from improper manipulation." *ATSI*, 493 F.3d at 102.

In addition, "[t]o determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct . . . ." *Tellabs*, 551 U.S. at 323–324. The inference of scienter "need not be irrefutable," but "must be more than merely 'reasonable' or 'permissible' -- it must be . . . cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. In determining whether this standard has been met, a court must consider "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Id.* at 323.

The Complaint pleads facts that, taken collectively, raise a strong inference of scienter. The Complaint alleges that Crede sold TREC stock to drive the stock price down below the exercise prices in the Warrants, obtain access to more common stock for a lower price, and resell the stock at a profit when Crede ceased its large volume sales and the stock rebounded. The inference of fraudulent intent is buttressed by Crede's failure to file timely Schedules 13D, reporting its purchases and sales of TREC stock. These allegations do not merely allege that Crede had a "general business motive to make profit" by tying the large volume sales to a legitimate trading strategy. *See, e.g., In re Merrill Lynch Auction Rate Sec. Litig.*, 851 F.Supp.2d 512, 528 (S.D.N.Y. 2012) *aff'd sub nom. Louisiana Pac. Corp. v. Merrill Lynch & Co.,* 571 Fed. Appx. 8 (2d Cir. 2014) (scienter allegations fall short of the motive and opportunity standard

when "they amount to no more than allegations of a general business motive to make a profit");

*accord Hudson Bay Master Fund Ltd. v. Patriot Nat'l, Inc.*, 309 F. Supp. 3d 100, 119 (S.D.N.Y.

2018). Instead, the Complaint identifies a "scheme to take advantage of depressed prices."

*Steginsky v. Xcelera Inc.*, 741 F.3d 365, 369 (2d Cir 2014); *see also, e.g., Sharette*, 127 F. Supp.

3d at 94–95 (holding that the general allegation that Credit Suisse received a commission for

underwriting the issuer's offering did not sufficiently allege scienter, but the allegation that

Credit Suisse engaged in short-sales of the issuer's stock as part of a scheme to promote itself to

lucrative hedge funds clients sufficiently alleged scienter).

Crede argues these scienter allegations are implausible because Crede fares better when

TREC's common stock trades above the exercise price. When TREC's stock price is high,

Crede contends that it can "exchange its Warrants for the exercise price and sell the issued shares

for a profit," but when TREC's stock trades below the exercise price, "although the number of

shares issued to Crede . . . might increase" this is "*directly offset* by the lower price per share."

Crede's argument ignores a key component of the manipulative scheme alleged in the Complaint

-- that Crede engaged in large volume sales to depress the stock price *temporarily,* acquire the

shares at a cheap price under the Warrants, and sell them after the price rebounds.

Crede offers a non-culpable explanation by contending that it "was simply exercising its

contractual right to obtain a return on its $5 million investment." However, this theory does not

explain why Crede failed to file Schedule 13D reports disclosing its purchases and sales of TREC

stock, or why Crede continued dumping TREC stock after its price fell and further sales were likely

to depress the stock price even more. These allegations make the inference that Crede's large

volume sales were motivated by a desire to depress the price of TREC stock to obtain a lower

exercise price at least as compelling as the inference that the sales were nothing more than Crede's

attempts to reap a return on its investment.

### 3. Reliance

"[M]anipulation violates Section 10(b) when an artificial or phony price of a security is communicated to persons who, in reliance upon a misrepresentation that the price was set by market forces, purchase [or sell] the securities." *Fezzani*, 716 F.3d at 25.

The Complaint plausibly pleads reliance because it alleges that when TREC honored Crede's requests to exercise its warrant rights at the Cashless Exercise price, TREC assumed that the stock price used in the Cashless Exercise was the product of an efficient market free of manipulation and not an artificially low price set by Crede's manipulative conduct. Citing no case law, Crede argues that when TREC signed the SPA, it had an "absolute and unconditional obligation to honor Crede's exercise notices" and thus, "TREC could not have relied on its stock price in deciding whether to honor Crede's exercise notices." Under Crede's logic, a buyer would be free to enter into an option contract, blatantly manipulate the price of the underlying security and cash out its options at a profit without facing any securities fraud liability. TREC has an "absolute and unconditional obligation" to honor Crede's exercise notices according to the bargained-for Cashless Exercise and Cash Exercise formulas in the SPA. These formulas assume that the market price at which TREC stock trades is set by an efficient market, not one rigged by Crede's manipulation. The Complaint sufficiently pleads that TREC relied on the integrity of the stock price in converting Warrants to shares.

### 4. Loss Causation

At the pleading stage, a plaintiff must allege "damage . . . caused by reliance on an assumption of an efficient market free of manipulation." *ATSI*, 493 F.3d at 101. The Complaint adequately pleads loss causation by alleging that if Crede had not artificially depressed the price of TREC common stock, Crede would not have been entitled to invoke the Cashless Exercise.

As a result, TREC lost the "approximately $5,945,000" it would have received if Crede exchanged Warrants for common stock using the Cash Exercise. These allegations sufficiently plead loss causation because they show a "link between the alleged manipulative scheme and . . . [TREC's] damages." *See Sharette*, 127 F. Supp. 3d at 103.

Defendant argues that this theory of damages is too speculative because TREC's stock "already was trading *below* the cashless exercise price both when TREC signed the SPA, and when the first and second tranches closed." However, from July 25, 2016, to September 30, 2016, apart from two days when the transaction between Crede and TREC occurred, TREC common stock consistently closed above the exercise price of $0.8291 for shares under the Series A Warrant, the warrant for which Crede issued exercise notices.[8] TREC's stock price dipped below the exercise price for Series A Warrants on October 3, 2016, soon after TREC's Registration Statement was declared effective and Crede allegedly began selling substantial quantities of the TREC common stock. As the Complaint links Crede's manipulative sales to an artificial decrease in TREC's stock price and a resulting decrease in the amount TREC received when converting warrant shares into common stock, loss causation is sufficiently pleaded. *See CompuDyne*, 453 F. Supp. 2d at 828–29 (holding that the complaint plausibly pleaded loss causation when it alleged that the defendants' trading "artificially depressed and/or increased the volatility" of the issuer's stock and absent this conduct, the issuer "would have received a price higher than $12 per share" in its offering).

The Complaint states a §10(b) market manipulation claim as to Crede, and the motion to dismiss as to this claim is denied.

---

[8] Courts are "entitled to take judicial notice of well publicized stock prices without converting the motion to dismiss into one for summary judgment." *Acticon AG v. China N. E. Petroleum Holdings Ltd.*, 692 F.3d 34, 37 n.1 (2d Cir. 2012).

### 5. Application to Wellington

The Complaint alleges that Wellington "active[ly] participat[ed]" in Crede's scheme by failing to disclose the altered inputs to the Standard Black Scholes Model. The Complaint makes no specific allegations connecting Wellington to Crede's alleged scheme. A conclusory allegation of participation is insufficient to state a plausible claim for relief under the heightened pleading standards of Rule 9. *See ATSI*, 493 F.3d at 105 (holding that the complaint failed to state a claim against a defendant when it simply stated that it was a "cooperating broker-dealer" without "any allegations of specific acts by [that defendant] to manipulate the market"). The market manipulation claim as to Wellington is dismissed.

### D.    Section 13(d) Claim

Section 13(d) of the Exchange Act requires a purchaser that acquired beneficial ownership of more than 5% of a company's registered equity securities, within 10 days of purchasing them, to disclose certain information to the issuer, exchanges on which the security is traded and the SEC. 15 U.S.C. § 78m(d). Rule 13d-1, promulgated under § 13(d), provides that any person who becomes "directly or indirectly the beneficial owner of more than five percent of [a registered equity security] shall . . . file . . . a statement containing the information required by Schedule 13D," 17 C.F.R. § 240.13d-1(a), or a Schedule 13G when the purchaser "[h]as not acquired the securities with any purpose, or with the effect, of changing or influencing the control of the issuer." 17 C.F.R. § 240.13d-1(c). SEC regulations define "control" for the purposes of § 13(d) as "the possession, direct or indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise." 17 C.F.R. § 240.12b-2.

Issuers may bring a private cause of action for injunctive relief, but not damages, under §
13(d) when a beneficial owner has failed to report beneficial ownership, *Hallwood Realty
Partners, L.P. v. Gotham Partners, L.P.*, 286 F.3d 613, 620 (2d Cir. 2002), or for filing a false or
misleading Schedule 13D or 13G. *United States v. Bilzerian*, 926 F.2d 1285, 1298 (2d Cir.
1991) ("A duty to file under § 13(d) creates the duty to file truthfully and completely."); *accord
United States v. Wey*, No. 15 Civ. 611, 2017 WL 237651, at *7 (S.D.N.Y. Jan. 18, 2017).
However, the circumstances under which plaintiff may obtain injunctive relief under § 13(d) are
limited. An issuer is entitled to an injunction "for a violation of § 13(d) only on a showing of
irreparable harm to the interests which that section seeks to protect." *CSX Corp. v. Children's
Inv. Fund Mgmt. (UK) LLP*, 654 F.3d 276, 286 (2d Cir. 2011). "[T]he goal of § 13(d) is to alert
the marketplace to every large, rapid aggregation or accumulation of securities ... which might
represent a potential shift in corporate control." *Id.* (quoting *Treadway Cos., Inc. v. Care Corp.*,
638 F.2d 357, 380 (2d Cir.1980)). "Those interests [protected by § 13(d)] are fully satisfied
when the shareholders receive the information required to be filed." *ICN Pharm v. Khan*, 2 F.3d
484, 489 (2d Cir. 1993).

The Complaint alleges that Crede failed to file a Schedule 13D. Crede filed two
corrective Schedule 13Gs in March 2018, before the Complaint was filed. As the interests of
§13(d) "are fully satisfied when the shareholders receive the information required to be filed,"
these corrective filings cure Crede's failure to file timely Schedule 13Ds. *See id.*

The Complaint also alleges that Crede falsely attested in its Schedule 13D that it did not
intend to exert control over TREC. This allegation is undermined by the fact that the SPA
expressly prohibits Crede from making any structural changes to TREC, voting its common
stock and obtaining beneficial ownership of more than 9.9% of TREC's common stock.

Finally, the Complaint alleges that Crede misstated its beneficial ownership of TREC in its Schedule 13G filings.  Even assuming the truth of this allegation, TREC is not entitled to any relief under §13(d).  As Crede is contractually restricted from translating its ownership of stock into influence over TREC's policies, Crede's actions do not indicate a potential shift in corporate control.  *See* 17 C.F.R. § 240.12(b)-2(f) (defining control as the power to "direct or cause the direction of the management and policies" of a company).  Thus, there is no "irreparable harm to the interests which . . . [§13(d)] seeks to protect," *CSX Corp.*, 654 F.3d at 286.  On the facts alleged, the Complaint does not raise a claim for injunctive relief under § 13(d), and the claim is dismissed.  *See Treadway*, 638 F.2d at 380 (affirming district court's grant of defendant's motion to dismiss a § 13(d) claim when "on the facts alleged, [plaintiff] . . . was not entitled to injunctive relief").

### E. Section 29(b) Claim

The Complaint's § 29(b) claim to render the PAA, SPA and the Warrants voidable fails because these contracts do not require the performance of an illegal act.  Section 29(b) of the Exchange Act states:

> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, . . . the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void . . . .

15 U.S.C. § 78cc(b).  This provision provides for the "rescission of a contract if the contract violates any provision of the [Exchange] Act or its regulations."  *Boguslavsky v. Kaplan*, 159 F.3d 715, 722 (2d Cir. 1998).

Courts in this circuit have repeatedly held that contracts can be held unenforceable under § 29(b) only when the contract "on its face" requires the performance of an illegal act.  *See, e.g., Dervan v. Gordian Grp. LLC*, No. 16 Civ. 1694, 2017 WL 819494, at *11 (S.D.N.Y. Feb. 28,

2017) (collecting cases); *Antares Mgmt. LLC v. Galt Glob. Capital, Inc.*, No. 12 Civ. 6075, 2013 WL 1209799, at *9 (S.D.N.Y. Mar. 22, 2013) ("To find a contract unenforceable for illegality at the pleading stage, the question is whether the contract 'on its face' requires the unregistered finder to perform broker services.").

The Complaint alleges that the SPA and the PAA are voidable by TREC because they violate "various provisions of federal securities laws and SEC regulations," without identifying any specific provision or violation. To the extent these allegations rest on the alleged payment of fees to two advisors who were not registered broker-dealers, nothing in the SPA or PAA required that payments be made to unregistered persons. To the extent this claim rests on Crede's failure to file a timely Schedule 13D, nothing in the parties' agreements obligates Crede to refrain from filing required disclosures with the SEC. The § 29(b) claim is dismissed.

## F.     State Law Claims

The Complaint's breach of contract claims against Wellington and Crede are dismissed. The Complaint's breach of the duty of good faith and fair dealing claim is dismissed as to Wellington, but not Crede.

### 1.  Breach of Contract

To state a claim for breach of contract under New York law, "the complaint must allege: (i) the formation of a contract between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." *Nick's Garage, Inc. v. Progressive Cas. Ins. Co.*, 875 F.3d 107, 114 (2d Cir. 2017) (applying New York law).

#### a.  Crede

The Complaint fails to allege that Crede breached the SPA. The SPA prohibits Crede from "engag[ing] or participat[ing] in any actions, plans or proposals which relate to or would

result in . . . causing a class of securities of the Company to be delisted from a national securities exchange." The Complaint does not allege that Crede's activities caused the NYSE to delist TREC's stock, but that Crede's activities put TREC's stock "*in danger* of being delisted." Specifically, it alleges that Crede depressed TREC's stock price to $0.26 per share, and that the NYSE would have delisted the stock had it fallen below $0.20.

In a contract dispute governed by New York law,[9] "the threshold question is whether the contract is ambiguous . . . which is a question of law for the court." *Great Minds v. Fedex Office & Print Servs., Inc.*, 886 F.3d 91, 94 (2d Cir. 2018) (applying New York law). "[I]f a contract is straightforward and unambiguous, its interpretation presents a question of law for the court to be made without resort to extrinsic evidence." *Spinelli v. Nat'l Football League*, 903 F.3d 185, 200 (2d Cir. 2018) (applying New York law).

The contract language prohibiting activities that "would result in" causing a class of securities to be delisted is unambiguous. The parties' use of the term "would" -- rather than "could" or "is likely to" -- does not proscribe activities that merely create a risk that the NYSE would delist TREC's stock. The term "would" is the past tense of "will," which is "used to express futurity" or an "inevitability," rather than a risk or a likelihood.[10] *See Will, Merriam-Webster Dictionary* (10th ed. 1998). Thus, the SPA prohibits activities that necessarily result in

---

[9] Section 9(a) of the SPA states that "All questions concerning the construction, validity, enforcement and interpretation of this Agreement and the other Transaction Documents [The Warrants and the Convertible Notes] shall be governed by the internal laws of the State of New York." Section 10(c) of the PAA states, "This Agreement shall be governed by and construed in all respects under the laws of the State of New York." Per the terms of the parties' agreements, New York law applies. *See Ministers & Missionaries Ben. Bd. v. Snow*, 45 N.E.3d 917, 922 (N.Y. 2015) ("New York courts should not engage in any conflicts analysis where the parties include a choice-of-law provision in their contract . . .").

[10] Even when "would" is used as the subjunctive past of "will," implying some condition, the condition is merely the prohibited activity -- i.e., Crede may not engage in any actions that would result in causing a class of TREC's securities to be delisted (if Crede engaged in them).

delisting, but not, as the Complaint alleges, those that put TREC's stock "in danger" of being delisted. As the Complaint does not allege that Crede breached the SPA, the breach contract claim against Crede is dismissed.

### b. Wellington

The Complaint alleges that Wellington materially breached the PAA by (1) failing to disclose to TREC that Crede altered the Black Scholes Value in the Warrants; (2) failing to disclose that Wachs was a convicted felon and barred from the securities industry; (3) directing a portion of the commission TREC paid to Wellington to Kisin, an unregistered broker-dealer, in violation of applicable federal securities laws and FINRA regulations.

First, the Complaint does not allege that Wellington even knew the facts that it did not disclose. Second, the Complaint fails to identify any provision in the PAA that obligated Wellington to disclose facts about the Black Scholes Value or Wachs, an alleged principal of Crede rather than Wellington. Indeed, the § 10(e) of the PAA expressly disclaims any "fiduciary, advisory, or agency relationship" between Wellington and TREC, and by signing the PAA, TREC "acknowledge[d] that it is solely responsible for making its own judgments in connection with the [SPA]."

The Complaint alleges that Wellington breached the provision that obligates the PAA to comply with applicable FINRA regulations and securities laws by directing a portion of TREC's commission to an unregistered broker-dealer. However, the PAA does not violate the securities laws as nothing in the agreement requires an illegal payment to an unregistered broker-dealer. Even if the PAA were somehow construed to require Wellington as a contractual matter to comply with the securities laws, and even assuming that Wellington made an unlawful payment to Kisin, Plaintiff has not alleged how it was damaged as a result of the breach.

## 2. Breach of Good Faith and Fair Dealing

The Complaint alleges a violation of the implied duty of good faith and fair dealing against Crede and Wellington. "Under New York law, a covenant of good faith and fair dealing is implied in all contracts." *Fishoff v. Coty Inc.*, 634 F.3d 647, 653 (2d Cir. 2011) (internal citations omitted) (citing New York law). "The implied covenant of good faith and fair dealing bars a party from taking actions 'so directly to impair the value of the contract for another party that it may be assumed that they are inconsistent with the intent of the parties.'" *LJL 33rd St. Assocs., LLC v. Pitcairn Properties Inc.*, 725 F.3d 184, 195 (2d Cir. 2013). "The implied covenant of good faith cannot create duties that negate explicit rights under a contract." *Id.* (applying New York law).

### a. Crede

The Complaint plausibly alleges that Crede has breached the implied covenant of good faith and fair dealing by artificially driving down the price of TREC stock to obtain common stock for a cheaper price under the Cashless Exercise. The Cash and Cashless Exercise provisions of the SPA use the market price of TREC stock to calculate the value at which Crede can exchange warrant shares for common stock, and the Complaint alleges that TREC expected that the stock price used in the exchange formulas would be set by an efficient market, taking into account "all information required to be disclosed." By manipulating and artificially depressing the price of TREC stock, Crede "depressed the consideration . . . [TREC] received pursuant to their contract[] and undermined the contractual bargain" set forth by the exchange formulas in the SPA -- that Crede could exchange warrant shares for a price that reflected the true market value for TREC stock, and not a rigged price. *See In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 962 F. Supp. 2d 606, 632–33 (S.D.N.Y. 2013) ("By allegedly

manipulating . . . [the benchmark rate for swaps] downward, such that it was lower than it would have been if set according to its definition, defendants . . . undermined the contractual bargain whereby plaintiffs agreed to pay a certain fixed rate in exchange for receiving a rate that reflected prevailing interest rates.")

Citing *LJL 33rd St.*, 725 F.3d at 196, Crede argues that TREC has an "absolute and unconditional" obligation to honor the exercise notices and, as a result, TREC's bad faith claim negates Crede's "unambiguous contractual rights." Crede's reliance on *LJL 33rd* is misplaced. That court held that the defendant's "decision to exercise its contractual right, *absent bad faith conduct*, cannot be deemed a breach of its duty to deal . . . in good faith." *LJL 33rd St.*, 725 F.3d at 196 (emphasis added). Here, the Complaint plausibly alleges bad faith by pleading facts regarding Crede's efforts to manipulate the price of TREC's stock to get a better-than-bargained-for deal on its warrant shares. Crede's implied duty to refrain from manipulating the stock price does not negate its "explicit contractual right" to exchange Warrants for common stock at the *bargained-for* price -- that is, one that reflects the true market price of TREC stock. *In Re LIBOR*, 962 F. Supp. 2d at 633 n.33 (holding that the defendants' "implied duty not to manipulate . . . [the benchmark rate for interest swaps] does not negate explicit rights under the parties' contracts" (internal alterations omitted)).

### b. Wellington

The Complaint fails to state a breach of good faith and fair dealing claim against Wellington. The Complaint alleges that Wellington breached its duty of good faith and fair dealing by (1) failing to disclose to TREC that Crede altered the Black Scholes Value in the Warrants; and (2) failing to disclose that Wachs, an alleged principal of Crede, was a convicted felon. First, the Complaint does not allege that Wellington knew these facts that it allegedly

concealed.  Second, the Complaint does not allege how the alleged failures "directly impair[ed] the value of the contract" between Wellington and TREC -- i.e., the PAA, which appointed Wellington as the exclusive placement agent for the Crede investment.  *See LJL 33rd St.*, 725 F.3d at 195.  Third, the PAA expressly disavows the existence of a fiduciary relationship between TREC and Wellington and states that TREC "acknowledges that it is solely responsible for making its own judgments in connection with the [SPA]."  For these reasons, the breach of good faith and fair dealing claim against Wellington is dismissed.

### G.    Abstention

Crede requests that the Court abstain from exercising jurisdiction over any surviving claims under the *Colorado River* doctrine.  That application is denied.  A federal district court should abstain "'only in the exceptional circumstances where the order to the parties to repair to the state court would clearly serve an important countervailing interest.'"  *Kaplan v. Reed Smith LLP*, 17-4067-CV(L), 2019 WL 1246305, at *2 (2d Cir. Mar. 19, 2019) (quoting *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 813, (1976)).

> Courts consider the following six factors in deciding whether to abstain:
>
> (1) whether the controversy involves a res over which one of the courts has assumed jurisdiction; (2) whether the federal forum is less inconvenient than the other for the parties; (3) whether staying or dismissing the federal action will avoid piecemeal litigation; (4) the order in which the actions were filed, and whether proceedings have advanced more in one forum than in the other; (5) whether federal law provides the rule of decision; and (6) whether the state procedures are adequate to protect the plaintiff's federal rights.

*Id.*  In evaluating these factors, where a factor "is facially neutral, that is a basis for retaining jurisdiction, not for yielding it."  *Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist.*, 673 F.3d 84, 101 (2d Cir. 2012) (internal quotation marks omitted).

These factors weigh in favor of this Court's exercising jurisdiction in this case. The first two factors are neutral and thus favor retaining jurisdiction. *See id.* at 101 ("There is no property or res at issue here. This factor therefore weighs against abstention"); *Roy v. Bank of New York Mellon*, 2018 WL 4771898, at *5 (E.D.N.Y. Sept. 30, 2018) ("[B]ecause both forums are within the state of New York . . . the forums are equally convenient."). The third factor weighs in favor of exercising jurisdiction because there is no risk of inconsistent judgments. . *See id.* (citing *Woodford v. Cmty. Action Agency of Greene Cty, Inc*., 239 F.3d 517, 524 (2d Cir. 2001), construing the third factor as typically concerned with whether the federal lawsuit "pose[s] a risk of inconsistent outcomes not preventable by principles of res judicata and collateral estoppel"). The fourth factor is neutral, or at most weighs very slightly in favor of abstention, because the state action was filed two months before the federal action, and the state court denied Crede's motion for a preliminary injunction on November 21, 2018. The fifth and sixth factors weigh in favor of exercising jurisdiction because federal law provides the rule of decision for Plaintiff's principal remaining claim, the § 10(b) market manipulation claim, over which federal courts have exclusive federal jurisdiction. *See Niagara Mohawk*, 673 F.3d at 102 ("When the applicable substantive law is federal, abstention is disfavored."); *Mazuma Holding Corp. v. Bethke*, 1 F. Supp. 3d 6, 21 (E.D.N.Y. 2014) ("[B]ecause federal courts have exclusive jurisdiction over the Exchange Act claims[,] . . . [the] federal claims cannot be vindicated in the state court proceeding [and the state forum] will not adequately protect their rights."). The Court thus declines to abstain from exercising jurisdiction over the surviving claims.

## IV.    CONCLUSION

For the foregoing reasons, the motions to dismiss of Defendants Wellington, Peizer and Wachs are GRANTED, and they are dismissed from the case. Crede's motion to dismiss is

GRANTED IN PART -- the claims against Crede are dismissed except the market manipulation claim under §10(b) and Rule 10b-5 in Count I, and the common law good faith and fair dealing claim in Count V.  For clarity, Count I is dismissed to the extent that it is based on a theory of misrepresentation.  The Clerk of Court is respectfully directed to close the motions at Docket Number 33 and 36.  By April 5, 2019, the parties shall file proposed case management plan in the form that appears at http://nysd.uscourts.gov/judge/Schofield.

Dated: March 26, 2019
     New York, New York

                               LORNA G. SCHOFIELD
                         UNITED STATES DISTRICT JUDGE